## ENERGY DEVELOPMENT CORPORATION

v.

**Michael X. ST. MARTIN, Virginia Rayne St. Martin, and the Louisiana Land and Exploration Company**

**Nos. Civ.A. 98–3395, Civ.A. 99–1793.**

United States District Court,
E.D. Louisiana.

Dec. 12, 2000.

John Franklin Whitney, James A. Barton, III, David Randolph Richardson, Barton, Richardson, Canseco & Whitney, New Orleans, LA, Raymond G. Hoffman, Jr., Metairie, LA, for Plaintiff.

Andrew J. Gray, Wade Thomas Visconte, Gray Law Firm, Lake Charles, LA, for Defendants.

## MEMORANDUM OPINION

CHARLES SCHWARTZ, Jr., District Judge.

The captioned consolidated cases, within the diversity jurisdiction of this Court as shown below, came on for bench trial on Monday, May 15, 2000. The clash is over title to mineral rights to certain properties located in the Lake Hatch–Sunrise Field area of Terrebonne Parish which plaintiff Energy Development claims *via* Mineral Conveyance dated May 3, 1971, effective January 1, 1971, recorded under Entry No. 402359 of the records of Terrebonne Parish, Louisiana [EDC Exhibit 26].[1] Essentially, EDC contends that its predecessor, Pelto Oil Company, acquired a single

---

1. It is EDC's contention that *via* the such May 3, 1971 Mineral Conveyance, Southdown Lands conveyed to Pelto Oil Company, EDC's predecessor in title, "all of its right, title and interest in and to all oil, gas and other minerals located in, on or under all lands now or formerly owned by Vendor, wherever situated, including but not limited to, the lands listed on the Exhibit attached [to the May 3, 1971 Mineral Conveyance] as Exhibit 'A'...." See, EDC's Exhibit 26.

large contiguous mineral servitude covering the tracts at issue in this case[2] and that its servitude which includes the tracts at issue has been maintained by operations and production on the contiguous acreage described in the May 3, 1971 Mineral Conveyance.

Defendant surface owners dispute EDC's ownership of mineral rights citing conveyances executed in their favor, ten year prescription of non-use, and claiming, *inter alia,* that the May 3, 1971 Mineral Conveyance recites only an ambiguous, omnibus description of the property . and thus, conveyed nothing.

As previously noted, the lead case, a declaratory judgment action numbered Civil Action 98–3395 on the docket of this Court, involves a tract of approximately 170 acres upon which the defendant, Louisiana Land and Exploration Co. ("LL & E"), obtained mineral leases from both the plaintiff EDC and the defendant surface owners, Michael X. St. Martin, Virginia Rayne St. Martin, and Quality Environmental Processes, Inc. (hereinafter referred to as "the St. Martin Group"). The consolidated action numbered 99–1793 was also instituted by EDC and involves the existence of a mineral servitude in favor of EDC on a tract in Terrebonne Parish approximately 1,000 acres in area. The latter suit additionally involves the two unit tracts of defendant surface owners, Bayou Area Children's Foundation, Inc. (the "Foundation"), Samuel Stagg, III, M.D., husband of/and Julie M. Stagg (the "Staggs"), James G. Fister, husband of/ and Linda F. Fister (the "Fisters").

## I. THE PARTIES—DIVERSITY JURISDICTION

Plaintiff, Energy Development Corporation ("EDC"), seeks a declaration as to the continued existence of its alleged single large contiguous mineral servitude which includes both the 170 acre and the 1000 acre tracts which are the subject of these consolidated cases. EDC also seeks a permanent injunction prohibiting interference with its use and enjoyment of the tracts included in its large contiguous servitude in the Lake Hatch—Sunrise Field area of Terrebonne Parish.

The St. Martin Group and the Bayou Area Children's Foundation (the "Foundation"), the Staggs and the Fisters, counterclaimed against EDC for damages and for judgment declaring that EDC owns no servitude with respect to either the 170 acre tract or the 1,000 acre tract.

Louisiana Land and Exploration Company ("LL & E") maintains it is a disinterested stakeholder, whereas all other defendants dispute the existence and/or viability of entirety and/or portions of EDC's claimed servitude. All of the mineral rights which are the subject of the captioned consolidated cases are within the "Lake Hatch Field–Sunrise Field" area in Terrebonne Parish, Louisiana.[3]

EDC, albeit presently a Delaware corporation, was a New Jersey corporation with its principal place of business in Oklahoma, at the time of the filing of all of the claims, counter-claims, cross-claims, etc. in the captioned proceedings.[4] The defendant surface owners include the Michael St. Martin, Virginia Rayne St. Martin ("the St. Martins"), Quality Environmental Pro-

---

2. The issue in dispute in these consolidated proceedings is the ownership of minerals underlying two tracts of land in Terrebonne Parish, Louisiana, an approximately 170 acre tract that is the subject of the CA 98–3395 and an approximately 1000 acre tract that is the subject of CA 99–1793, along with two unit tracts in the 88 Reservoir A, Sand Unit A, and 88 Reservoir B Sand Unit A, the surface of said unit tracts being owned by the Staggs and the Pfisters.

3. See, Stipulations, at Section II, the St. Martins' Stipulated Finding of Fact No. 3 (hereinafter referred to St. Martin SFOF) [attached hereto as Addendum A].

4. See, Stipulations, at Section I, EDC's Stipulated Finding of Fact (hereinafter EDC SFOF), No. 7 and at Section II, St. Martin SFOF No. 1A [Addendum A].

cesses, Inc. ("QEPI"), the Bayou Area Children's Foundation ("the Foundation"), Samuel J. Stagg, III, M.D., Julie M. Stagg ("the Staggs"), James G. Fister and Linda F. Fister ("the Fisters"). Defendant surface owners along with EDC are also defendants with respect to the statutory interpleader filed by the LL & E.

Michael St. Martin, husband of/and Virginia Rayne St. Martin (sometimes hereinafter referred to as the "St. Martins"), are individual defendants who reside in Houma, Louisiana. Defendant, Quality Environmental Processes, Inc. ("QEPI"), is a Delaware corporation with its principal place of business in Louisiana. Bayou Area Children's Foundation, Inc. (the "Foundation") is a Louisiana corporation domiciled in Terrebonne Parish, Louisiana. Samuel Stagg, III, M.D., husband of/and Julie M. Stagg (the "Staggs"), are individuals who reside at 3613 Bayou Black Dr., Houma, Louisiana. James G. Fister, husband of/and Linda F. Fister (the "Fisters") are individuals who reside at 3449 Bayou Black Dr., Houma, Louisiana.[5] All of these defendants aforementioned in this paragraph may be referred to hereinafter from time to time as "surface owners."

Defendant/Plaintiff–in–the–Interpleader, LL & E, is a Maryland corporation with its principal place of business in Texas.[6] Pursuant to 28 U.S.C. § 1335 and *via*

**5.** *Id.* at Section I, EDC SFOF Nos. 1 through 5, and at Section II, St. Martin SFOF Nos. 1C through 1G [Addendum A].

**6.** Stipulations, at Section I, EDC SFOF No. 6, and at Section II, St. Martin SFOF No. 1B [Addendum A].

**7.** LL & E was the operator of all interests in the Units (i.e., LL & E Cenac Well No.1/Unit Well for 88 RA SUA Unit and Burlington Resources Phillips No. 1/Unit Well for 88 RB SUA Unit created by Conservation Order No. 276 V) for the production of unitized oil, gas, and other hydrocarbons. See, St. Martin SFOF Nos. 25, 26, and 27. As operator, LL & E produced and sold oil, gas and other hydrocarbons from the Units. See, St. Martin SFOF No. 28. The funds on deposit in the registry of the Court have accrued because of

counterclaim, cross-claim, and/or third party demand, LL & E filed an interpleader premised on minimal diversity required for statutory interpleader. The sum of $294,170.45 is presently on deposit in the registry[7] of the Court and the amount in controversy exceeds $75,000.00. Neither jurisdiction nor venue are contested.[8] The issues of liability and quantum were bifurcated and the issue of liability was the subject of a three-day bench trial which commenced on Monday, May 15, 2000.

## II. CONTENTIONS OF THE PARTIES

There are four tracts of land which are the subjects of these consolidated proceedings, to wit: (1) the 170 acre tract that is the subject of CA 98–3395 involving EDC and the St. Martin Group; (2) the 1000 +/acre tract which is the subject of docket No. 99–1793 involving EDC and the St. Martin Group; and (3) the two small unit tracts in the 88 Reservoir A, Sand Unit A, and 88 Reservoir B Sand Unit A, the surface of said unit tracts being owned by the Staggs and the Fisters. Although the ultimate issue before the Court is the mineral ownership of those four tracts,[9] counsel for EDC correctly notes those tracts figure only marginally in the two principal debates between it and the surface owners in these consolidated proceedings.

the production of unitized oil, gas, and other hydrocarbons and the disposition of same by LL & E. See, St. Martin SFOF No. 29 [Addendum A].

**8.** Both consolidated suits are premised on complete diversity of citizenship between EDC and the defendants.

**9.** Southdown Lands, Southdown Inc. and Realty Operators are all predecessors in title to the St. Martin Group, the Staggs, the Fisters and the Foundation by virtue of the following chain of title: EDC Exhibits 73, 64, 141, 141A, 141B, 50, 138/48, 38, 243, 242, 241, 194/147, 193, 192/146, 191, 47, 46, 45, 34, 197, 196, 240, 238, 238A, 237, 236, 235, 134/27, 133/29, 131/22, 129/8, 127/5, 124/1, 125/2, 3, 212, 122, 123, 213, and 121. See, EDC SFOF No. 18.

The immediate issues focus rather on the mineral ownership of a tract of land lying to the south of those four tracts referred to throughout this opinion and the testimony of expert witnesses as the red-outlined "Protective Area." [10] For ease of reference the Court will refer to EDC's Map No. 10 [EDC Exhibit 216] throughout this Memorandum Opinion, since it best graphically illustrates the relative locations of the various tracts at issue. As previously mentioned, the tract lying to the south of the surface owner's tracts will be herein after referred to as the red-outlined "Protective Area." [11] If the "Protective Area" is found to be only a portion of a single large contiguous mineral servitude conveyed by Southdown Lands to EDC's predecessor, Pelto Oil Company, by a mineral conveyance dated May 3, 1971 [EDC Exhibit 26], as EDC maintains, the defendant surface owners have conceded that "operations on the southern portion of such servitude would be sufficient to maintain the entire servitude." [12]

EDC claims title to the minerals and the ownership thereof beneath the property at issue devolved upon it allegedly *via* a mineral conveyance dated May 3, 1971 and effective January 1, 1971.[13] EDC's position is that pursuant to Southdown Lands' May 3, 1971 mineral conveyance to EDC's predecessor, Pelto Oil Company, it acquired a single large contiguous mineral servitude covering, *inter alia*, the 170 acre tract at issue in Civil Action number 98–

3395 and the 1,000 acre tract at issue in Civil Action number 99–1793, as well as other contiguous acreage including the Staggs' and Fisters' unit tracts.

Counsel for EDC points out that both EDC and the defendant surface owners claims stem from a common ancestor in title, Southdown, Inc. which owned both the mineral rights and the surface of the tracts at issue in this case.

Defendants, the St. Martin Group, claim full ownership (i.e., ownership of the land and interest in the minerals beneath the same 170 acre, 1000 acre, and two unit tracts by virtue of their ownership of an undivided interest in and to the fee title to the aforesaid tracts and the alleged lapse of any servitude claimed by EDC due to ten year prescription for non-use.) The St. Martin Group's claims of ownership of the lands which are the subject of these consolidated proceedings are based upon the following enumerated instruments: (1) Contran Realty Corp. to Michael St. Martin dated 6/23/92 recorded under Entry No. 900447 as corrected by instrument 9/4/92 under Entry No. 903752. [EDC Exhibit No. 73]; (2) Ag–Lands Investment Co. to Michael St. Martin *et ux* dated 6/11/84 recorded Entry No. 739234 (EDC Exhibit Nos. 146/194); and (3) Ag–Lands Investment Co. to Michael St. Martin et ux dated 10/24/84 recorded under Entry No. 744732 (EDC Exhibit Nos. 147/194).[14] The Fisters claim of ownership to that portion

---

**10.** See, EDC Map No. 10 [EDC Exhibit 216].

**11.** The relative location of "Protective Area" to the four tracts at issue in this case is depicted in Map 10 [EDC No. 216]. It shows that all four tracts lie to the northeast of the northern most portion of the red-outlined "Protective Area," which "Protective Area" was created by the August 31, 1966 Agreement between Southdown Inc. and Southdown Exploration Company. [EDC Exhibit 13].

**12.** See, Pretrial Order, Uncontested Fact No. 38.

**13.** See, MINERAL CONVEYANCE BY SOUTHDOWN LANDS, INC. TO PELTO OIL COMPANY, dated May 3, 1971, effective Jan-

uary 1, 1971 with attachments (EDC Exhibit 26) [attached as Addendum No. D]. Exhibit "A" to the May 3, 1971 Southdown Lands Mineral Conveyance to Pelto specifically incorporates by reference at item 22 the document and description of lands described in the instrument recorded in Terrebonne Parish, at COB 496, Entry No. 383344, which in turn refers to and incorporates by reference, the lands described in the 1944 Realty Operators' mortgage, also recorded in Terrebonne Parish at MOB 90, Page 342, Entry No. 56703.

**14.** See, Pretrial Order, Section 7 Uncontested Facts, No. 1A–1C.

of their lands is based upon either or both: (1) Ag–Lands Invest Co. to James Gary Fister, et ux dated 2/10/84 recorded under Entry No. 725824 (EDC Exhibit No 238); and (2) Ag–Lands Investment Co. to James Gary Fister, et ux dated 6/6/84 recorded under Entry No. 734278 (EDC Exhibit No. 240).[15]  The Staggs claim of ownership is based upon both: (1) Ag–Lands Investment Co. to Samuel J. Stagg, III, et ux dated 9/10/87 recorded under Entry No. 810398 (EDC Exhibit No. 242); and (2) Ag–Lands Investment Co. to Samuel J. Stagg, III, et ux dated 2/12/88 recorded under Entry No. 820404 (EDC No. 243).

The defendants urge the Court to find as a matter of fact that they are owners of the properties which are the subject of the consolidated captioned matters and that mineral rights relating to such property have been extinguished or terminated by prescription resulting from nonuse for ten years.

More specifically, the defendants contend that any mineral rights EDC claims in the subject property could only be based on the May 3, 1971 Mineral Conveyance by Southdown Lands, Inc. to EDC's predecessor Pelto Oil Company, recorded in COB 515, Folio 73, Entry No. 402359 of the records of Terrebonne Parish (EDC Exhibit No. 26).   Counsel for the defendant surface owners contends that May 3, 1971 instrument contains only a vague and ambiguous omnibus property description which is insufficient as a matter of law to give notice to the defendants, who are third parties to the May 3, 1971 Servitude Agreement.   Defense counsel argues that the May 3, 1971 Mineral Servitude does not describe St. Martin Contiguous Property or property owned by the Foundation, the Staggs or the Fisters.

Alternatively, and in the event that the Court finds the record documents sufficiently describe the one large contiguous servitude claimed by EDC, defense counsel argues the obligation which is subject to a suspensive condition described in the August 31, 1966 Agreement [EDC Exhibit 13] which refers to some twenty (20) listed sands within the wrap-around red-outlined "Protective Area" which tract lies to the south of their tracts, constitutes an attempt to extend the prescriptive period, and thus, somehow removed the "Protective Area" in its entirety from commerce making any part of it insusceptible of conveyance to Pelto Oil Company, EDC's predecessor in title.   Also, as the argument goes, the St. Martin Group apparently contends that the August 31, 1966 instrument somehow created a mineral servitude with respect to the red-outlined Protective Area, such that there were no mineral rights left within the red-outlined "Protective Area" susceptible of conveyance later by Southdown Lands, Inc. *via* the May 3, 1971 mineral conveyance, since such rights were specifically excepted from the transfer.

The St. Martins' argument is that if the red-outlined "Protective Area" in its entirety is excepted or excluded from the one large contiguous servitude claimed by EDC, such would make such a servitude several noncontiguous tracts.   Stated another way, with the red-outlined "Protective Area" completely carved out of the May 3, 1971 servitude, it does not create one large contiguous servitude but rather affects noncontiguous tracts, and thus, operations on any one tract would not interrupt prescription as to any other noncontiguous tract.

EDC counters the surface owners' contentions regarding excluding the red-outlined "Protective Area," with the clear wording of the August 31, 1966 agreement itself.   Plaintiff's counsel argues that the August 31, 1966 agreement, within the boundary established by the red-outline (i.e., the "Protective Area"), at best, burdens only certain listed sands/horizons, and then only, with a conditional future obligation and not a servitude upon the entirety of the "Protective Area."   EDC's

---

**15.**  *Id.,* at No. 2A–2B.

position is precisely that August 31, 1966 Agreement by its terms: (1) neither presently effected any conveyance of mineral rights nor a mineral servitude with respect to the entirety of the property bounded by red-outline [i.e., the wrap-around "Protective Area"]; and (2) it patently addressed only certain listed sands and *not* all horizon's within the confines of the red-outlined "Protective Area."

Suffice it say, EDC's position is that even if only one horizon or sand within the red-outlined "Protective Area" was not conveyed prior to the execution of the May 3, 1971 servitude, then the red-outlined "Protective Area" was conveyed to EDC's predecessor, Pelto Oil, making such conveyance but one servitude, on one large contiguous tract, as the May 3, 1971 instrument plainly suggests.

The issues outlined above turn on the proper interpretation of the instruments, various clauses and property descriptions, as well as plats and surveys, registered in the conveyance records of Terrebonne Parish. Their interpretation, the law with respect thereto, and the effect as to third parties constitute the meat of the questions involved in this case.

It is appropriate to note here, again, that it was stipulated in the pre-trial order that in the event the Court finds that one large contiguous servitude was sufficiently documented in the Terrebonne Parish records prior to the conveyances of the subject four tracts to the respective defendant surface owners in these consolidated cases, then plaintiff EDC's petroleum operations on the southern portion of such single large contiguous servitude are sufficient to maintain the entire servitude.[16]

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW [17]

The Court will not reiterate the parties' stipulations entered at the time of trial. Instead, and as previously mentioned, the Court attaches to its Memorandum Opinion a copy of the respective parties Stipulations as Addendum A. The Court's opinion, as is explained in great detail herein below, is that the August 31, 1966 agreement [EDC Exhibit 13] created no present mineral rights which burdened the entirety of the red-outlined "Protective Area" and thus, a single large contiguous mineral servitude remained in tact as such thereafter and following the May 3, 1971 Mineral Conveyance to EDC's predecessor in title, Pelto Oil Company. In other words, there still existed mineral rights capable of alienation in the "Protective Area" at the time of the May 31, 1971 mineral conveyance [EDC Exhibit 26] to EDC's predecessor. Additionally, the May 3, 1971 conveyance sufficiently described the affected areas so as to put the St. Martin Group on notice, in that it specifically described by incorporating by reference an adequate description of the contiguous tracts covered by the May 3, 1971 Mineral Servitude. It was not and cannot be seriously disputed that the May 3, 1971 mineral conveyance specifically referred to and incorporated the conveyances and property descriptions contained in such other conveyances/instruments of record in Terrebonne Parish,[18] which as part of public record were

---

**16.** See, Pretrial Order, at Section VII entitled Uncontested Facts, No. 38, at p. 21, wherein it is stated that: "If EDC has established ownership of one large contiguous servitude, which is denied by the St. Martins, Quality, the Foundation, the Staggs and the Fisters, defendants concede that operations on the southern portion of such a servitude would be sufficient to maintain the entire servitude."

**17.** To the extent that any of the Court's findings of fact constitute conclusions of law, they are so adopted. And also, to the extent that

any of the Court's conclusions of law constitute findings of fact they are so adopted.

**18.** The May 3, 1971 Mineral Conveyance refers to and incorporates by reference, the Sale of Property by Southdown, Inc. to Southdown Lands, Inc., dated June 17, 1970 recorded in the Terrebonne Parish Records at COB 496, Page 305, Entry No. 383344 (EDC Exhibit 22/St. Martin Exhibit 11), which in turn refers to and incorporates by reference, the 1944 mortgage by Realty Operators, Inc., Southdown's ancestor in title, recorded in MOB 90,

available to third parties. All of the Court's findings are discussed in detail herein below.

### A. The August 31, 1966 Agreement

By instrument dated August 31, 1966, recorded COB 433, Folio 128 of the records of Terrebonne Parish,[19] Southdown, Inc. conveyed to Southdown Exploration, Inc. all of its rights title and interest in and to the oil, gas and other minerals located in, on or under the lands outlined on plats outlined in blue on the plats marked Exhibits "A" through "H" and attached to the 1966 Agreement. These plats marked as Exhibits "A" through "H" to the 1966 agreement covered (8) separate, non-contiguous areas located in four different parishes. As previously mentioned "on each of the plats attached to the August 31, 1966 are *blue outline(s)* reflecting the boundaries of that particular Productive Area(s) within which Southdown, Inc. was conveying a mineral servitude to Southdown Exploration, Inc. The relevant plat to this litigation is the plat attached to the 1966 agreement as Exhibit 'D'."[20] Exhibit "D", the plat which is a copy of a Tobin map, is labeled "Lake Hatch Field Sunrise Field Terrebonne Parish, LA."

In this same August 31, 1966 instrument, Southdown Inc. obligated itself, subject to the condition described below, to make *future* conveyances to Southdown Exploration of the minerals in certain specifically identified sands, called *Known Productive Sands*, located in lands *surrounding* the Productive Areas. These lands surrounding the identified "Productive Area" were identified as the red-out-lined "Protective Area", and all such lands within the Lake Hatch Field Sunrise Field area were illustrated by the Tobin Map attached as Exhibit "D" to the 1966 agreement [EDC Exhibit 13]. This obligation to make future conveyances of any of the listed Known Productive Sands in the Protective Areas was *conditioned* on any such named sand being found at some future date to be *capable of production in the Protective Areas*.[21]

Essentially, the Mineral Conveyance dated August 31, 1966 [EDC Exhibit 13] conveyed to Southdown Exploration, Inc., all of Southdown, Inc.'s

> right, title, and interest in and to the oil, gas and other minerals located in, or under the lands outlined in blue on the plats marked Exhibits "A" through "H", which said Exhibits are attached hereto and made part hereof in full by reference, covering lands located in St. James, Terrebonne, Ascension and Lafourche Parishes, Louisiana. The lands outlined in blue on Exhibits "A" through "H" are herein sometimes referred to as the "Productive Area." [EDC Exhibit 13].

It is quite apparent from the plats attached to the 1966 Mineral Conveyance that the blue-outlined area on each is the "Productive Area" and that the red-outlined area on each is the "Protective Area." The precise language of the act leaves no room to doubt and confirms beyond cavil: (1) the identity of each area outlined in blue on the plats as the "Productive Area," and (2) the identity of each area outlined in red on the plats as the "Protective Area."[22]

Page 342, Entry No. 56703 (EDC Exhibit 96/ St. Martin Exhibit 5).

**19.** EDC Exhibit 13.

**20.** Stipulations, at Section I, EDC's SFOF No. 9 [Addendum A]; and the August 31, 1966 Agreement.

**21.** See, EDC's SFOF Nos. 10 and 11 [Addendum A].

**22.** The 1966 Mineral Conveyance reads in pertinent part at numbered page 2:

> On the plats annexed hereto as Exhibits "A" through "G", there is outlined in red an additionally area adjacent to each of the Productive Areas shown on the plats. The lands lying between the limits of the Productive Area as outlined blue and the red outline in each instance are hereinafter referred to as the "Protective Area." See,

As previously mentioned, although several maps or plats were attached to the August 31, 1966 agreement, the one identified as Exhibit "D" and labeled "Lake Hatch Field · Sunrise Field Terrebonne Parish, La.", is the plat which is relevant to the issues in dispute between the EDC and the defendant surface owners in these consolidated proceedings.

The "Lake Hatch Field Sunrise Field Terrebonne Parish, LA." plat, Exhibit "D" to the 1966 agreement, is a copy of a Tobin map. Certain geographic areas are delineated with red and blue lines, which lines are not described by reference to any measure, bearing, or direction. With respect to the red and blue-outlined Protective and Productive Areas, the parties agreed to cause accurate surveys of these areas and to later substitute detailed survey plats of these red-outlined and blue-outlined areas, respectively, the "Protective" and the "Productive" areas.

Regarding the August 31, 1966 act, it is not disputed that: (1) the parties to the 1966 act expressly agreed to cause an accurate survey of each of the areas outlined in blue (i.e., the "Productive Area"), and to substitute such detailed surveys for the plats attached to the 1966 act and identified as Exhibits "A" through "H"; [23] (2) to substitute detailed survey plats of all the areas outlined in red, (i.e., the "Protective Area"); and not withstanding that, (3) no such surveys of the blue-outlined "Productive Area" or the red-outlined "Protective Area" were ever recorded in Terrebonne

Parish's public records. This is of no moment, however, because of the stipulated fact that "[n]either the tracts which are the subjects of these two consolidated suits for declaratory judgment, nor the unit tracts which are the subject of LL & E's consolidated interpleader suit are in either the Productive or Protective Areas described in Exhibit "M" to the August 31, 1966 agreement." [24]

■ This is not a boundary dispute regarding the red-outlined Protective Area, and the defendant surface owners' tracts are uncontrovertedly outside of the red-outlined Protective Area. The defendant surface owners' reference to the August 31, 1966 agreement is for the purpose of illustrating that the red-outlined "Protective Area" was somehow removed from commerce and thus, excluded or excepted from the May 31, 1971 conveyance to Pelto, EDC's predecessor.

The evidence and the August 31, 1966 instrument itself, supports no such assumption or conclusion. The only legal significance which can arguably be ascribed to the red-outlined "Protective Area" described by the August 31, 1966 agreement and depicted on the attached Lake Hatch Field Sunrise Field Map [EDC Exhibit 13 attachment "D"] is that such red-outlines depict the outer limits or geographical boundaries of the conditional future obligation with respect to the twenty (20) listed sands.[25]

---

1966 Mineral Conveyance, at numbered p. 2 [EDC Exhibit 13].

**23.** The agreement included that if any area outlined in blue did not include all units or acreage assigned to producing wells within the Productive Area at the time of the 1966 act, the act would be corrected retroactively to include such additional acreage.

**24.** See, Stipulations, Section I, EDC's SFOF No. 14 [Addendum A].

**25.** The Court rejects St. Martin Group's contention that the red and blue outlines somehow form or set out some legal barrier making the conveyance of a single large servitude

on May 3, 1971, an impossibility. See, Transcript, Vol. IV, pp. 368 and 370. Mr. Camp was asked by the St. Martin Group's counsel to assume that the red-outline of the "Protective Area" constituted some sort of "legal barrier," either entirely or as to some 20 sands listed. Mr. Camp testified summarily, that the tracts at issue in this case were non-contiguous to each other—that was, however, assuming the red and blue lines are some sort of legal barrier lines that break up the property. *Id.* The Court rejects Mr. Camp's opinion in this regard, because there is no basis in fact or in the law for making any such assumption.

The August 31, 1966 agreement identified twenty (20) "Known Productive Sands" located within the "Protective Area." These sands were listed on Exhibit "I" attached to the 1966 agreement. The specific language in the August 31, 1966 act dealing with the conditional obligation regarding the aforesaid twenty listed "Known Productive Sands" in the red-outlined Protective Area, reads as follows:

> As an essential and integral part of the consideration paid for this conveyance, *Grantor binds and obligates itself to convey to the Grantee, from time to time as required, all of its right, title and interest in and to the oil, gas, and other minerals in each Known Productive Sand when and if such sand is established to be productive or capable of production in the Protective Area.... If and when any Known Productive Sand is established to be productive or capable of production within the Protective Area as above provided, Grantor shall then be obligated to convey to Grantee the mineral rights in such Known Productive Sand as to the entirety of that Protective Area.... Each obligation to make such additional mineral conveyances as to Known Productive Sands shall arise immediately and automatically whenever any Known Productive Sand is established to be productive and capable of production in any portion of the Protective Area as provided above.... As heretofore provided, conveyances shall be made from time to time whenever the conditions set forth above shall occur,* and the execution of the conveyance of mineral rights in an area or as to one Known Productive Sand shall not relieve Grantor of the obligation to make additional conveyances in the same area as to additional Known Productive Sands if the conditions set forth above requiring such additional conveyances in the same area or as to additional Known Productive Sands if the conditions set forth above requiring such additional conveyances thereafter occur. *Each conveyance shall be effective as of the date that a Known Productive Sand, or Known Productive Sands, is established to be productive or capable of production in the Protective Area. Each obligation of the Grantor to make an additional assignment shall be subject to enforcement through specific performance by the Grantee.*

*See,* August 31, 1966 Agreement, at numbered pages 2–4 [EDC Exhibit 13] (emphasis supplied). "There is no obligation in the August 31, 1966 agreement with respect to the Lake Hatch Field–Sunrise Field, conditional or otherwise, to make future conveyances of minerals in the subject Protective Area in any sands or depths other than the twenty listed sands." [26] Also, and as previously mentioned, it is not disputed that the tracts which are the subject of these consolidated proceedings, including the unit tracts which are the subject of LL & E's interpleader suit are not within either the red-outlined Protective Area or the blue-outlined Productive Area discussed above.

With respect to the Lake Hatch Field Sunrise Field area, there appears no obligation in the August 31, 1966 agreement, conditional or otherwise, to create one large mineral servitude bound by the red-outlined "Protective Area." The 1966 agreement specifically refers to the twenty (20) listed Known Productive Sands or horizons within the "Protective Area." It clearly sets forth the conditional future obligation [27] to transfer "all of [grantor's] right, title, and interest in and to the oil, gas and other minerals **in each Known**

---

**26.** See, Stipulations, Section I, EDC's SFOF No. 13 [Addendum "A"].

**27.** "A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until a certain event occurs, the condition is suspensive." La. Civ.Code art. 1767.

Productive Sand." *Id.* (emphasis supplied).

The August 31, 1966 agreement further provides that:

> Grantor further agrees that during the existence of this obligation, any alienation, mortgage or encumbrance granted by Grantor and affecting the Protective Areas lying between the blue lines and the red lines on Exhibits "A" through "G" will specifically stipulate that the Vendee, mortgagee or grantee thereunder shall accept the same, subject to the terms and conditions of this agreement, and shall commit itself to the performance of Grantor's obligations hereunder as to the lands affected by such alienation, mortgage or encumbrance, unless Grantor, in such Act reserves all mineral rights to such lands. *Id.*, at numbered page 4.

The Court finds such a subsequent conveyance of the Protective Area in the Lake Hatch/Field–Sunrise Field, whereby Southdown Lands, Inc. acquired fee title to the subject property from Southdown, Inc. See, Conveyance from Southdown, Inc. to Southdown Lands, Inc. dated June 17, 1970 [EDC Exhibit 22/St. Martin Exhibit 11]. Thereafter as discussed in detail below, by virtue of a mineral conveyance dated May 3, 1971, effective January 1, 1971, recorded under Entry No. 402359 of the records of Terrebonne Parish, Pelto Oil Company [EDC's predecessor] was granted a mineral servitude by Southdown Lands, which included the 170 acre tract, the 1000 acre tract and the two unit tracts at issue in these consolidated proceedings.

**B.  The May 3, 1971 Mineral Conveyance Agreement**

As previously mentioned, on June 17, 1970, Southdown, Inc. conveyed to Southdown Lands, Inc. fee title to all properties listed on an attached Exhibit "A", which describes the properties conveyed, **incorporating by reference previously recorded documents,**[28] which specifically describe the property. In other words, the land referred to in June 17, 1970 conveyance to Southdown Lands, Inc. is described in the act as "the lands listed on the Exhibit attached hereto as Exhibit 'A'...."[29]

A review of Exhibit "A" to the June 17, 1970 conveyance to Southdown Lands, Inc. reveals the Terrebonne Parish recordation of a 1944 mortgage by a prior owner in the chain, Realty Operators, Inc., in favor of Jefferson Standard Life Insurance Company, recorded under MOB 90, Entry No. 56703.[30] The 1944 mortgage and the description of lands set forth therein were specifically incorporated by reference. Exhibit "A" to the June 17, 1970 Conveyance states in pertinent part: "reference to which documents as so recorded being made for all legal purposes to the same effect **as though the said documents and a description of lands therein described were copied herein in extenso....**"[31] The June 17, 1970 Conveyance to Southdown Lands, Inc. along with its Exhibit "A" was recorded at entry number 383344 of the records of the Terrebonne Parish Clerk of Court on June 24, 1970.

It was stipulated that "Southdown Lands, Southdown Inc., and Realty Operators are all predecessors in title to the St. Martin Group, the Staggs, the Fisters and the Foundation by virtue of the following

**28.** See, June 17, 1970 Conveyance from Southdown, Inc. to Southdown Lands, Inc. [EDC Exhibit 22].

**29.** *Id.; see also,* Stipulations, Section I, EDC SFOF No. 17 [Addendum A], which states: "The property being conveyed in the June 17, 1970 conveyance was described in Exhibit 'A' attached thereto by reference to previously recorded documents. Exhibit 'A' to EDC Exhibit 22 reflects that there is only one Terrebonne Parish entry, a mortgage by a prior owner in the chain, Realty Operators, Inc., in favor of Jefferson Standard Life Insurance Company, recorded under MOB 90, Entry No. 56703. (EDC Exhibit 96)."

**30.** See, June 17, 1970 Conveyance, at Exhibit "A", para. A(2).

**31.** *Id.,* at para. A (emphasis supplied).

chain of title: EDC Exhibits 73, 64, 141, 141A, 141B, 50, 138/48, 38, 243, 242, 241, 194/147, 193, 192/146, 191, 47, 46, 45, 34, 197, 196, 240, 238, 238A, 237, 236, 235, 134/27, 133/29, 131/22, 129/8, 127/5, 124/1, 125/2, 3, 212, 122, 123, 213, and 121." [32]

Following Southdown, Inc.'s June 17, 1970 sale of its fee title interest to all of its land, including the lands located in all "Productive Areas" and "Protective Areas" to Southdown Lands Inc., Southdown Lands Inc. conveyed to Pelto Oil Company [EDC's predecessor in title],[33] a mineral servitude covering all of its interest in all oil, gas and minerals in the lands then owned by it, including those lands located in the "Protective Area" of the Lake Hatch/Sunrise Field, by deed dated May 3, 1971 [EDC Exhibit 26].

By its terms the May 3, 1971 instrument conveys to Pelto (EDC's predecessor) "all of grantor's right, title and interest to all oil, gas and other minerals" located in the various tracts described by the attached Exhibit "A", with the exception of rights that had been previously conveyed. The May 3, 1971 Mineral Conveyance set forth the following specific exception, to wit:

"1). There is excepted from the Conveyance here made all mineral rights, royalties and leasehold interests heretofore conveyed or transferred by Vendor or its predecessors in title to third parties or terminated by prescription." [EDC Exhibit 26].

As previously discussed above in Section A of the this Memorandum Opinion, the obligation prescribed by the August 31, 1966 agreement, was merely a conditional future obligation regarding the Protective Area, which was, in any event, limited to specific sands or "horizons" in the Protective Area, such that there **remained mineral rights in the Protective Area** capable of being conveyed *via* the May 31, 1971 Conveyance to Pelto Oil Company, EDC's predecessor.

Also as previously mentioned, Exhibit "A" to the May 3, 1971 agreement contained no property description *per se*, but it did incorporate by reference the June 17, 1970 Conveyance, an act recorded act in Terrebonne Parish, to wit:

"1). That certain sale of property from Southdown Inc., to Southdown Lands, Inc., passed before Luther E. Hall, Jr., Notary Public in and for Orleans Parish, Louisiana under the date of June 17, 1970, and recorded as follows...." [EDC Exhibit 22].

This is followed by recordation references including the act recorded in Terrebonne Parish, at COB 496, entry no. 383344 (i.e., the June 17, 1970 Conveyance referred to herein above). Also, and as previously mentioned, the June 17, 1970 Conveyance [EDC Exhibit 22] describes the lands as the "the lands listed on the Exhibit attached as Exhibit "A", which in turn incorporates by reference the description of lands set forth in Realty Operators' September 8, 1944 mortgage, recorded in Terrebonne Parish at MOB 90, entry number 56703. [EDC Exhibit 96].

Turning to the relevant September 8, 1944 Act of Mortgage [EDC Exhibit 96/St. Martin Exhibit 5], entry number 56703, MOB 90, recorded in the records of the Terrebonne Parish Clerk of Court on September 9, 1944, it is a "metes and bounds" description of the single large contiguous mineral servitude (i.e., the May 3, 1971 Mineral Conveyance), at issue in this case.

## C. Discussion of Evidence Presented and the Applicable law

The obligation in the August 31, 1966 agreement is clearly with respect to: (1) mineral **rights** in connection with certain listed sands only, which sands are located

---

**32.** Stipulations, at Section I, EDC SFOF No. 18 [Addendum A].

**33.** In 1989, by merger, EDC became the successor of Pelto Oil Company (i.e., the Grantee in the May 3, 1971 agreement.) See, Merger of Pelto and EDC [EDC Exhibit 68/St. Martin Exhibit 20].

in the Protective Area; (2) the conveyance of such rights **in the future**; and (3) conditioned upon the occurrence of an event that may or may not ever occur. [EDC Exhibit 13]. In determining the intention of the parties to a contract, the clear wording of the contract which speaks to "the common intent of the parties"[34] cannot be ignored.

Civil Code Article 2053 provides the frame work for interpretation in the case where a contractual provision is perceived as doubtful and states:

> A doubtful provision must be interpreted in the light of the nature of the contract, equity, usages, **the conduct of the parties before and after the formation of the contract,** and of other contracts of a like nature between the same parties.

La. Civ.Code art.2053. (emphasis supplied).

It is difficult if not impossible to reasonably conclude, as the St. Martin Group urges, that the subject Protective Area was somehow excluded from the later May 3, 1971 conveyance by its specific exclusionary language. If that were the case, the facts before the Court would be that after May 3, 1971, Southdown Lands, Inc. and/or its successors, and not Pelto and its successor EDC, would have granted mineral leases covering the much-discussed Protective Area.

The facts before the Court regarding the conduct of the parties after the formation of the contract are indisputedly that no less than twenty-two (22) mineral leases covering portions of the Protective Area were executed by Pelto Oil Company, and/or its successor, EDC, subsequent to May 3, 1971.[35] There is no evidence to the effect that any mineral leases covering any portion of the Protective Area at issue were executed by Southdown Lands or its successors to the surface ownership of the Protective Area during the twenty-six (26) year period following the May 3, 1971 conveyance. That record remained unbroken until May of 1997, when the St. Martins granted a lease to LL & E.

The evidence before this Court further shows that five (5) wells were drilled within the subject Protective Area by lessees of Pelto Oil Company and/or EDC subsequent to May 3, 1971. [EDC Exhibits 152 *in globo* and 166].

Also, the Court cannot ignore the fact of the June 24, 1982 mineral assignment **by Pelto** to Aminoil **regarding "Known Productive Sand" labeled "D–12"** on Exhibit "I" to the August 31, 1966 agreement. The June 24, 1982 Pelto/Aminoil assignment [EDC Exhibit 52] recognized that it was being made in conformance with the obligations imposed by the August 31, 1966 agreement. [EDC Exhibit 13]. The Pelto/Aminoil mineral assignment (EDC Exhibit 52) states that "Pelto ... is the owner of the oil, gas and other minerals formerly owned by Southdown, Inc., under the instrument effective as of August 31, 1966" and that the mineral conveyance of a 60% mineral interest is being made "in conformance with the obligations imposed in said Conveyance." [EDC Exhibit 52].[36]

Simply stated, the defendants have identified no shortfall in the 1966 agreement which would negate the later conveyance

---

**34.** La. Civ.Code art.2045 provides:

> Interpretation of a contract is the determination of the common intent of the parties.

**35.** Mr. Keith Hebert (Mr. Hebert), EDC's expert petroleum landman, testified after the May 31, 1971 conveyance that there were 22 oil and gas leases and one option executed by Pelto or EDC. The leases were identified as EDC Exhibits 28, 30, 35, 40–44, 49, 51, 62, 63, 65, 70, 80–84, 86, 87 and 91, EDC Exhibit 88 being the option. None of the leases excluded any of the twenty (20) listed sands that were the subject of the August 31, 1966 agreement. Transcript, Vol. IV, pp. 317–318.

**36.** Mr. Hebert, testified regarding Pelto's June 24, 1982 assignment to Aminoil of 60% in the D–12 sand which was identified in the August 31, 1966 agreement and that Valhi was the surface owner at the time of the June 24, 1982 assignment to Aminoil. Transcript, Vol. IV, pp. 318–319.

of a single large contiguous mineral servitude, on May 3, 1971. Per the August 31, 1966 agreement, future conveyances in the Protective Area referred to were **with respect to *certain sands* **[37] and are conditional future obligations. In this vein, the 1966 agreement does not refer to any servitude or to the Protective Area as a servitude, but rather uses the precise term mineral "rights," **to be** conveyed in the Protective Areas (i.e., conditional future rights). See, La. Civ.Code arts., 1767, 1775.

Counsel for EDC correctly points out that even if this Court were to assume that the August 31, 1966 affected some immediate or present right, such mineral right by the terms of the August 31, 1966 agreement itself affects only the twenty (20) listed sands or horizons. Louisiana's Mineral Code at La.Rev.Stat. 31:68 permits the creation of mineral servitudes with respect to certain sands or "horizons" and not others. Therefore, even assuming a mineral servitude as to certain sands, there is no basis for this Court to conclude that all depths, sands or "horizons" were conveyed by the August 31, 1966 agreement leaving nothing to convey to Pelto in the May 3, 1971 Mineral Conveyance. The Court agrees with EDC, that even one such horizon remaining unaffected by the 1966 agreement would make EDC's one large servitude contiguous.

Regarding the conditional future obligation with respect to the twenty listed sands within the "Protective Area", the Louisiana Civil Code pretermits any finding that such a conditional future obligation in the 1966 agreement so burdened the "Protective Area" as to take it out of commerce. Louisiana Civil Code article 1775 states in no uncertain terms that:

Fulfillment of a condition has effects that are retroactive to the inception of the obligation. Nevertheless, that fulfillment does not impair the validity of acts of administration duly performed by a party, nor affect the ownership of fruits produced while the condition was pending. **Likewise, the fulfillment of the condition does not impair the right acquired by third persons while the condition was pending.**

La. Civ.Code art. 1775 (emphasis added). Comment (b) to Article 1775 goes explains that "[w]here immovable property is concerned, any conflict must be resolved in light of the public records doctrine." *Id.* at Comment (b).

No doubt, at the time of the defendant surface owner's acquisitions (EDC Exhibits 73, 196, 197, 238, 240, 242, and 243) of the respective tracts at issue in these consolidated proceedings, under the public records doctrine each had a right to determine whether each such tract acquired was burdened with a servitude created by the May 3, 1971 conveyance. Exhibit "A" to the May 3, 1971 conveyance effectively communicates notice to third parties and permits finding that each such tract acquired was burdened by a single large contiguous servitude. The May 3, 1971 Mineral Servitude incorporated by reference other recorded instruments (i.e., the June 17, 1970 Conveyance [EDC Exhibit

---

**37.** La.Rev.Stat. 31:68 provides for the eventuality that a mineral servitude may be created with respect to certain sands or horizons and not others, to wit:

A single mineral servitude is established on a continuous tract of land notwithstanding that certain horizons or levels are excluded or the right to share production varies as to different portions of the tract or different levels or horizons.

The Comment to Louisiana's Mineral Code at 31:68 explains:

Article 68 is applicable even if the original conveyance includes rights to separate strata or defined depth levels as long as the rights conveyed underlie a continuous body of land on which a single servitude is created.

Simply stated, certain sands, levels or horizons may be excepted from a single large contiguous servitude as long as there is a continuous body of land, at least one horizon, on which the servitude is created. See, *Gulf Oil Corp. v. Clement,* 239 La. 144, 118 So.2d 361 (1960).

22], which in turn incorporated the 1944 mortgage [EDC Exhibit 96] ).[38]

It is the description in Realty Operators' 1944 recorded mortgage upon which EDC bases its mineral servitude on the tracts at issue in this case, including the "Protective Area," and the contiguous acreage described therein. Realty Operator's 1944 Mortgage described the tracts at issue and contiguous lands by section, township, plantation name [i.e., Waterproof], and by frontage on the bayou and by adjacent lands.

With respect to the EDC's single large contiguous servitude, Mr. Ralph Gipson ("Mr.Gipson"), EDC's expert surveyor, painstakingly went through the exercise of walking this Court line by line, mete by mete, bound by bound, around the entirety of EDC's single large contiguous servitude. He read aloud each affected tract from the 1944 mortgage and illustrated where each such tract was located utilizing EDC Map 6 [EDC Exhibit 162][39] for purposes of the exercise, highlighting in yellow to indicate contiguous acreage, and coloring in green each such tract. The 1944 mortgage unquestionably contains the description of EDC's single large contiguous mineral servitude. Mr. Gipson's coloring on Map 6, illustrated graphically for the Court the contiguity among the tracts described in the 1944 Mortgage.[40]

Article 63 of Louisiana's Mineral Code states that: "A single mineral servitude is created by an act that affects a continuous body of land although individual tracts or parcels within the whole are separately described." La.Rev.Stat. 31:63.

Now addressing the St. Martin Group's concerns with the adequacy of the property description set forth in the 1944 mortgage, issue was taken with respect to: (1) the northeastern boundary of EDC's servitude [i.e., that portion of Mandalay Plantation lying in the west 569 acres of Section 104, Township 17 South, Range 17 East];[41] and (2) that portion of the Waterproof Plantation lying to the west of the east 600 feet of Section 60, Township 17 South, Range 16 East, being that portion of the plantation that was not also identified by section, township and range in the 1944 mortgage (i.e., the northwestern boundary of EDC's servitude).

Considering such protestations, the Court can hardly ignore the June 23, 1992 Contran sale to Michael St. Martin involving the approximate 1000 acre tract at issue (EDC Exhibit 73) in this case. Mr. Gipson pointed out that it contains a "metes and bounds" description of the entire tract being acquired by the St. Martins and, not unlike the 1944 mortgage, provides several references to the Mandalay Plantation at Exhibit "A" (i.e., the ac-

---

**38.** Mr. Ralph Gipson, EDC's expert surveyor, testified as to the advantages of describing the property by incorporation by reference to previously recorded instruments, noting that there is nothing confusing about the methodology, one simply makes his way to the courthouse or has somebody else get the instrument for review. The advantage to description by reference to previously recorded instruments is that risk of typographical error from retyping a lengthy land descriptions is nil. (Transcript, Vol.II, p. 85, 11.18–25). It is not disputed that May 31, 1971 servitude agreement referred to and incorporated by reference one pertinent previously recorded document in the records of Terrebonne Parish (i.e., the June 17, 1970 conveyance from Southdown, Inc. to Southdown Lands, Inc. [EDC Exhibit 22], which in turn refers to and incorporates by reference Realty Operators

1944 Mortgage, MOB 90, entry 56703 [EDC Exhibit 96] ). Realty Operators' 1944 mortgage does contain a metes and bounds description of the lands which are the subject of the May 3, 1971 Mineral Servitude

**39.** As indicated above EDC's Map 6 was used for illustrative purposes only. This exercise could have been accomplished utilizing any map of the subject area which exhibited section, township and range lines.

**40.** Transcript, Vol. II, pp. 92–103.

**41.** The St. Martin Group maintains that that particular boundary, the northeastern boundary of EDC's servitude could be drawn with various slants and still obtain approximately 569 acres.

tual property description). (Transcript, Vol.II, p. 106).

In particular, Gipson noted the call, "north 61 degrees, 5 minutes east, a distance of 7,786 feet, plus or minus, **to a point on the eastern property line of** *Mandalay Plantation"* and "a distance of 895 feet, plus or minus, to a point of intersection **of said property line."** (Transcript, Vol. II, p. 107, 11. 6–20/EDC Exhibit 73 at Exhibit "A"). The sum and substance of the aforesaid testimony is that prior to the time of the St. Martins' July 23, 1992 acquisition from Contran the eastern boundary of the Mandalay Plantation was discernible and had been located by Mr. Camp, defendants' expert surveyor. The St. Martin's deed of acquisition from Contran in 1992 made calls and references to that very same boundary.

■ Counsel for EDC aptly describes the St. Martins' attack of the eastern boundary of EDC's servitude, as tantamount to an attack on the eastern boundary of their own surface ownership. Referring both to recorded documents and extrinsic evidence, Mr. Gipson testified credibly as to what inquiry would have revealed with respect to the eastern boundary of Mandalay Plantation and the western boundary of Waterproof.[42]

Gipson adopted a 1979 Charles Camp[43] survey. It is evident that Mr. Camp, defendant's expert, surveyed the same line in the context of a composite survey of Waterproof and Mandalay Plantations (EDC Exhibit 141A), which survey was recorded

on January 31, 1986, more than six years prior to the St. Martins' acquisition from Contran which had the same eastern boundary on June 23, 1992. (Tr. Vol.II, pp. 103–104). The Camp survey (EDC 141A) was also recorded prior to the Foundation's acquisitions in December 1989 and 1991 (EDC Exhibits 196 and 197) and Staggs' acquisitions in September 1987 and February 1988 (EDC Exhibits 242 and 243).

The Court has been cited no authority for the proposition that EDC must establish the outermost limits of its servitude. More to the point, research reveals no authority which would require proof of "the outermost limits" of the mineral servitude at issue, that is, limits which have nothing to do with the defendant surface owners' servient estates or the mineral operations at issue in this case.

The evidence of record is clearly to the effect that the northwest boundary of EDC's servitude does not affect and is not anywhere near the four tracts at issue in these consolidated proceedings. In any event, Mr. Gipson testified credibly that the western boundary of Waterproof Plantation had been surveyed, by Mr. Camp himself,[44] and that the Camp survey was attached to a 1980 Boundary Agreement[45] between A.L. Daspit, et al, and J.G. Robbins, then owner of Waterproof Plantation. Mr. Camp testified that: (1) Waterproof Plantation was in the general area of Sections 59 and 60; (2) historically, the tree line located in Section 59 marked the west-

42. Referring to Exhibits EDC Exhibit 145 and 145A, Gipson discussed the Survey of the Louisiana and Texas Intracoastal Waterway, illustrating to the Court the intersection of that waterway with the eastern boundary of Mandalay Plantation (i.e., the eastern boundary of the west 569 acres of Section 104), which the St. Group maintains is not locatable. Transcript, Vol. II, pp. 122–124. Gipson also discussed the 1926 T. Baker Smith plat, recorded in 1931, locating the Waterproof and the Mandalay Plantations. See, Transcript, Vol. II, pp. 109–111; EDC Exhibits 144, 144A, and 144B. Gipson then, engaged in another mind-numbing exercise of tracing

the St. Martins', the Fisters' and the Foundation's chain of title back to David Pipes, noting that the 1926 T. Baker Smith plat was referenced in a two mortgages by David Pipes, et al (EDC Exhibits 150 and 151). Transcript, Vol. II, pp. 111–122.

43. Charles Camp was the St. Martin Group's expert surveyor, who testified on their behalf at trial.

44. Transcript, Vol. III, pp. 183–184.

45. EDC Exhibit 115.

ern boundary of Waterproof Plantation (i.e., the boundary between Waterproof and Flora Plantations).[46] Camp's survey was recorded in April 1981, well before the defendant surface owners acquired their respective tracts.

The Court concludes that the description in the 1944 mortgage "locates the lands with sufficient certainty to be located by any one who is at all familiar with locating lands."[47] The documentary and testimonial evidence demonstrate that both Mr. Gipson (EDC's expert surveyor), and Mr. Camp (the St. Martin Group's expert surveyor), had little difficulty locating the boundaries called in the 1944 mortgage.

Mr. Keith Hebert utilized the chart set forth at EDC's Exhibit 245,[48] to illustrate the respective parties common chain of title from 1971 and prior thereto, going back to 1897. The Court uses the term common chain of title to connote common as between EDC, the St. Martin Group, the Fisters, the Staggs, and the Foundation—that is, the surface and minerals were common from May 31, 1971 back in time. Transcript, Vol. IV, p. 324. Mr. Hebert pointed out that the February 26, 1931 David Pipes, et al mortgage to Prudential (EDC Exhibit 150) covered properties being described as the west 569 acres of Section 104 and other properties, which were referred to as the Mandalay Plantation. He also noted that the single page plat (EDC Exhibit 144) was referred to in the 1931 Pipes mortgage property description (EDC Exhibit 150). Mr. Hebert pointed out that the mortgagors' deed of acquisition contained the same property description as the one in the 1931 Pipes

mortgage. He went on to explain that he found yet another Pipes, et al, mortgage (EDC Exhibit 151), which referenced the blue map by T. Baker Smith (EDC Exhibit 144). Within the body of this second Pipes, et al mortgage, just like the first, there is a description of Mandalay Plantation and other properties. David Pipes, et al, were the immediate predecessors in title to Realty Operators (EDC Exhibit 121), which executed the much-talked-about 1944 mortgage (EDC Exhibit 96/Addendum E). Also, David Pipes, et al, were predecessors in title to the St. Martin Group, the Foundation, the Fisters, and the Staggs. Transcript, Vol. IV, pp. 324–330.

Further, and insofar as notice is concerned, the Court cannot turn a blind eye to the fact that several conveyances to the St. Martin Group affecting 170 acre and the 1,000 acre tracts at issue, acknowledge the existence of the servitude, to wit: (1) the June 23, 1992 Contran Realty sale to Michael St. Martin (EDC Exhibit 73) acknowledges the existence of the mineral servitude wherein it states that the vendor and vendee acknowledge with the Exception of "B", more particularly described on Exhibit "B" and without intending to interrupt any prescriptive periods which may be presently accruing as to oil, gas, and other minerals lying in, on, or under the subject property, **have been previously conveyed**; (2) the June 11, 1984 AG–Lands Investment sale to Michael St. Martin (EDC Exhibit 192), which notes at page 2, paragraph 2, that "[n]o **minerals underlying the subject property are transferred herein, same having been severed**

**46.** Transcript, Vol. V, pp. 416–17, 419–20.

**47.** *Robinson v. Atkins*, 105 La. 790, 30 So. 231 (1901).

**48.** On cross-examination, Mr. Hebert readily admitted his chart which constituted EDC Exhbit 245 contained no reference to either the August 31, 1966 agreement or the D–12 sand conveyance to Aminoil. Transcript, Vol. IV, pp. 345 and 347. Hebert explained on redirect that the chart that comprises EDC

Exhibit 245 was constructed primarily to show surface ownership of the Waterproof and the Mandalay Plantations and for the purpose of showing the bounding owners of Flora Plantation, below and Bannan Bonvillain, above. Transcript, Vol. IV, p. 351. It did not show the 1944 mortgage or the August 31, 1966 agreement, as such was illustrated in the context of EDC Exhibit 165, which is entirely devoted to the Protective Area. *Id.*, at pp. 351–52.

by ancestors in title;" and (3) the October 24, 1984 AG–Lands Investment sale to Michael St. Martin (EDC Exhibit 194), similarly states at page 2, paragraph 2, that "[n]o minerals underlying the subject property are transferred herein, same having been severed by ancestors in title." Transcript, Vol. IV, pp. 336–338. The properties covered in the June 23, 1992 Contran Realty sale are the southern half of west 569 acres of Section 104, the properties covered in the June 11, 1984 AG–Lands sale are the center of the western 569 acres of Section 104, and in both Hebert's/Gipson's opinions, the two tracts covered in the October 24, 1984 AG–Lands sale lay within Section 104 are in the western half of the western 569 acres of Section 104, Township 17 South, Range 17 East. *Id.* at pp. 338–339, 349. Finally, Mr. Hebert pointed out that his search of the Terrebonne Parish Courthouse revealed an instrument titled "Act of Subordination Sale of Property, and Conveyance of Servitudes" (EDC Exhibit 48) involving Pelto Oil, Aminoil Development, Mr. Thomas Goldsby, Jr., James Robbins, and Valhi, Inc., predecessors in title to the St. Martin Group, the Staggs and the Fisters. Transcript, Vol. IV, pp. 339–341.

■ The description of property set forth in the 1944 mortgage does not merely describe the property by reference to the plantation names only. However, the Court here notes that Louisiana cases hold that the name of the plantation itself must be considered in identifying the property. In *Emerson v. Cotton,* 209 La. 1003, 26 So.2d 16, 18 (1946), the court stated:

This Court has held in a number of cases that where a plantation or property known by a specific name was conveyed, the name itself must be considered in identifying the property. In fact, some of the decisions go so far as to state that the name itself is almost a sufficient description. *Levy v. Ward,* 33 La.Ann. 1033; *Dickson v. Dickson,* 36 La.Ann. 870; *Bryan v. Wisner,* 44 La. Ann. 832, 11 So. 290; *Robinson v. Atkins,* 105 La. 790, 30 So. 231; *Suthon v. Laws,* 127 La. 531, 53 So. 852.

*Id.*

■ In the case at bar, as illustrated at length in Gipson's exercise discussed herein above, the 1944 mortgage **locates the plantation by name *and parish, on the left descending bank of Bayou Black,*** and *gives the frontage and depth* and *identifies the adjoining landowners.* This description of lands in the recorded 1944 mortgage, which description was incorporated by reference into the May 3, 1971 Mineral Conveyance, was sufficient to convey immovables under applicable Louisiana law and to put the defendant surface owners on notice,[49] that the May 3, 1971 Mineral Servitude covered one large contiguous area which covered the four tracts at issue and the pertinent mineral operations which maintained the single large servitude.

---

**49.** In *White v. Ouachita Natural Gas Co., Inc.,* the Louisiana Supreme Court summarized the rule regarding the sufficiency of a description insofar as third parties and notice is concerned as follows:

"It suffices if the description be such as to enable the court to determine with certainty, with the aid of such extrinsic evidence as is admissible under the rules of evidence, what property was intended by the parties to be covered thereby. The description need not be given with such particularity as to make resort to extrinsic evidence unnecessary." *Tircuit v. Burton–Swartz Cypress Co.,* 162 La. 319, 110 So. 489, 492.

Therefore, whilst an unrecorded deed can have no effect whatever on third persons, the same is not true where the deed is recorded but contains only an inaccurate or faulty description of the property but not so inaccurate or faulty as to be actually misleading. Hence when the only description in a mortgage was "one large property or tract at the corner of Orleans and Bourbon Streets" without any other boundaries given, this was held sufficient to put a purchaser on his guard. *Roberts v. Bauer,* 35 La.Ann. 453, citing *City Bank v. Denham,* 1844 WL 1351, 7 Rob. 39 (1844), and *Ells v. Sims,* 1847 WL 3359, 2 La.Ann. 251 (1847). See also, *Lee v. Long,* 166 La. 1084, 118 So. 320.

*Id.*

■ The Court finds that EDC has met its burden of proof under Louisiana Civil Code article 730[50] and other pertinent Louisiana law. The applicable law is precisely to the effect that utilizing the public records, the property at issue (i.e., the contiguous servitude insofar as it covers the four tracts at issue and pertinent mineral operations) must be located and identified, to wit:

> The description in a deed must be such that the property intended to be conveyed can be located and identified, and the general rule is that the description must fully appear within the four corners of the instrument itself, or that the deed should refer to some map, plat, or deed as a part of the description, so that the same may be clear.

Daigle v. Calcasieu Nat'l Bank in Lake Charles, 200 La. 1006, 9 So.2d 394, 397 (1942) (emphasis supplied).

The Court simply disagrees with the St. Martin Groups' argument that they were entitled to ignore 1944 mortgage recorded in Terrebonne Parish, since it was not attached to the May 31, 1971 Conveyance, but was instead referred to and incorporated by reference.

Considering the stipulation of the parties set forth at item 38 of the pre-trial order,[51] operations on the southern portion of EDC's single contiguous servitude were sufficient to maintain the EDC's entire servitude. Notwithstanding the stipulation, counsel for EDC preferred not to rest on the stipulation only. That was because of the St. Martin Groups' argument that the property descriptions were inadequate with respect to the western boundary of Waterproof Plantation and the eastern boundary of Mandalay Plantation. EDC thus, went the step further and adduced evidence which sufficiently proved that EDC did not rely on any mineral operations in either of the contested areas for the maintenance of its single large contiguous servitude.

Mr. Hebert's uncontroverted testimony in that vein was that since 1971, the longest period of time between spud dates of wells drilled on the servitude, (less and except the Protective Area, the entirety of Section 104 T17S, R17E, and the part of Waterproof Plantation not identified by section, township and range), was 5 years and nine months—that is, well within the 10 year prescriptive period set forth in article 27 of the Mineral Code. (Transcript, Vol.IV, p. 306). Regarding productive wells none were located in Section 104 T17S R17E or had a bottom hole location anywhere within the Protective Area. (Transcript, Vol.IV, p. 312). Mr. Hebert further testified that eight (8) years was the longest span of time since 1971 in which there was no production from any well drilled on the entire servitude.

## IV. CONCLUSION

For the reasons cited hereinabove and considering the evidence and the applicable law, it is this Court's considered opinion that EDC's predecessor, Pelto Oil Company, acquired a single large contiguous mineral servitude that at least covered the four tracts at issue. It acquired such a servitude via Mineral Conveyance dated May 3 1971, effective January 1, 1971, recorded under Entry No. 402359 of the records of Terrebonne Parish, which contained an adequate property description in that it incorporated by reference other recorded instruments that sufficiently described the location and extent of the large single contiguous servitude at issue. Finally, the aforesaid mineral servitude has been maintained, such that EDC is the owner of sums that have been deposited in the registry of this Court by LL & E and is further entitled to all future payments of all royalty on future production which are

---

50. "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." La. Civ.Code art. 730.

51. See, Note 16, supra.

attributable to it and its assigns, as Operator of the 88 RA SUA and 88 RB SUA units.

Accordingly,

IT IS ORDERED that the declaratory judgment action filed on behalf of the plaintiff Energy Development Corporation is GRANTED and judgment shall issue in favor of Energy Development Corporation and against the defendant surface owners herein, the St. Martin Group, the Foundation, the Staggs, and the Fisters, each party to bear their own costs.

IT IS FURTHER ORDERED that counsel for Energy Development Corporation shall forthwith submit the proposed form of judgment, consistent with the foregoing opinion of this Court.

### ADDENDUM "A"

## I. STIPULATIONS DERIVED FROM ENERGY DEVELOPMENT CORPORATION'S PROPOSED FINDINGS OF FACT

1. Michael St. Martin, husband of/and Virginia Rayne St. Martin (the "St. Martins") are individuals who reside in Houma, Louisiana.

2. Quality Environmental Processes, Inc. ("Quality") is a Delaware corporation, with its principal place of business in Louisiana. (The St. Martins and Quality will be referred to hereafter as the "St. Martin Group".)

3. Bayou Area Children's Foundation, Inc. (the "Foundation") is a Louisiana corporation, domiciled in Terrebonne Parish, Louisiana.

4. Samuel J. Stagg, 111, M.D., husband of/and Julie M. Stagg (the "Staggs") are individuals who reside at 3613 Bayou Black Drive, Houma, Louisiana.

5. James G. Fister, husband of and Linda F. Fister (the "Fisters") are individuals who reside at 3449 Bayou Black Drive, Houma, Louisiana 70360.

6. Louisiana Land and Exploration Company ("LL & E") is a Maryland Corporation with its principal place of business in Texas.

7. Energy Development Corporation ("EDC") is a Delaware corporation, which at the time of all the claims in these consolidated proceedings was a New Jersey corporation with its principal place of business in Oklahoma.

### FACTS RE DECLARATORY JUDGMENT

8. DENIED.

9. ADMITTED PER ST. MARTIN'S RESPONSE WHICH FOLLOWS:

On each of the plats attached to the August 31, 1966 agreement are blue outline(s) reflecting the boundaries of that particular Productive Area(s) within which Southdown, Inc. was conveying a mineral servitude to Southdown Exploration. The relevant plat to this litigation is the plat attached to the 1966 agreement as Exhibit "D".

10. In this same August 31, 1966 instrument, Southdown Inc. obligated itself, subject to the condition described below, to make future conveyances to Southdown Exploration of the minerals in certain specifically identified sands, called Known Productive Sands, located in lands surrounding the Productive Areas. These lands surrounding the Productive Areas were called Protective Areas.

11. This obligation to make future conveyances of any of the listed Known Productive Sands in the Protective Areas was conditioned on any such named sand being found at some future date to be capable of production in the Protective Areas.

12. These Known Productive Sands for the "Lake Hatch Field–Sunrise Field" were twenty in number and were listed and described on Exhibit "I" to the August 31, 1966 conveyance.

13. There is no obligation in the August 31, 1966 agreement with respect to the

Lake Hatch Field–Sunrise Field, conditional or otherwise, to make future conveyances of minerals in the subject Protective Area in any sands or depths other than the twenty listed sands.

14. Neither the tracts which are the subjects of these two consolidated suits for declaratory judgment, nor the unit tracts which are the subject of LL & E's consolidated interpleader suit are in either the Productive or Protective Areas described in Exhibit "M" to the August 31, 1966 agreement.

15. DENIED AS WRITTEN.

16. Admitted that the June 17, 1970 conveyance from Southdown, Inc. to Southdown Lands (EDC # 22) was executed, recorded, and speaks for itself.

17. The property being conveyed in the June 17, 1970 conveyance was described in Exhibit "A" attached thereto by reference to previously recorded documents. Exhibit "A" to EDC Exhibit 22 reflects that there is only one Terrebonne Parish entry, a mortgage by a prior owner in the chain, Realty Operators, Inc. in favor of Jefferson Standard Life Insurance Company, recorded under MOB 90, Entry No. 56703. (EDC Exhibit 96).

18. Southdown Lands, Southdown Inc. and Realty Operators are all predecessors in title to the St. Martin Group, the Staggs, the Fisters and the Foundation by virtue of the following chain of title: EDC Exhibits 73, 64, 141, 141A, 141B, 50, 138/48, 38, 243, 242, 241, 194/147, 193, 192/146, 191, 47, 46, 45, 34, 197, 196, 240, 238, 238A, 237, 236, 235, 134/27, 133/29, 131/22, 129/8, 127/5, 124/1, 125/2, 3, 212, 122, 123, 213, and 121.

19. DENIED.

20. DENIED.

21. DENIED.

22. Admitted that the May 3, 1971 Mineral Conveyance (EDC # 26) was executed, recorded, and speaks for itself.

23. Exhibit "A" to the May 3, 1971 mineral conveyance contains property descriptions by reference to previously recorded instruments, one of which is EDC Exhibit 22.

24. DENIED.

25. DENIED.

26. The St. Martins, the Staggs, the Fisters, the Foundation and Quality ("the surface owners") are the surface owners of various tracts of land in Terrebonne Parish Louisiana, the minerals underlying which are at issue in these consolidated cases.

27. The surface owners and EDC share the following ancestors in title and have common chains of title, *inter alia*, in the following respects:

A. DENIED.

B. DENIED.

C. ADMITTED AS CHANGED.
Realty Operators is a predecessor in title of the St. Martin Group by virtue of EDC Exhibits 73, 64, 50, 38, 27/134, 29/133, 22/131, 8/129, 97, 97A, 179, 5/127, 3, 2/125, 1/124, 212, 213, 122, 123, 121, 194/147, 193, 192/146, 191, 47, 138/48, 46, 45, and 34.

D. Realty Operators is a predecessor in title of the Bayou Area Children's Foundation tracts by virtue of EDC Exhibits 27/134, 29/133, 22/131, 8/129, 5/127, 212, 1/124, 121, 192/146, 196, 197, 191, 47, 138/48, 46, 45, and 34.

E. Realty Operators is a predecessor in title to the Fisters by virtue of EDC Exhibits 27/134, 29/133, 22/131, 8/129, 5/127, 1/124, 212, 121, 191, 47, 138/48, 235, 236, 237, 238, 238A, 240, 46, 45, and 34.

F. Realty Operators is a predecessor in title to the Staggs by virtue of EDC Exhibits 27/134, 29/133, 22/131, 8/129, 5/127, 3, 213, 212, 1/124, 122, 121, 241, 242, 243, 47, 138/48, 46, 45, and 34.

G. DENIED.

H. ADMITTED AS CHANGED.
Mary Minor Pipes, David W. Pipes, Jr., Margaret Minor Krumbhaar and Charles C. Krumbhaar, jointly, are the predeces-

sors in title of Realty Operators, Inc. and to the St. Martins in the three conveyances described above by virtue of EDC Exhibits 117, 220, 221, 222, 148A, 223, 225, 118, 224, 119, 120, 226, 227, and 121.

I. DENIED.

J. The mortgage (EDC Exhibit 149) refers to a plat entitled "Lands of Estate H.C. Minor" recorded in Conveyance Book 96, Entry No. 11063.

K. ADMIT THAT THE DOCUMENT WAS EXECUTED, RECORDED AND SPEAKS FOR ITSELF (EDC EXHIBIT 151).

L. DENIED.

M. DENIED.

28. The following documents were of record before *any* of the surface owners in this litigation acquired their interest in the surface:

1. 1926 T. Baker Smith Plat (EDC Exhibit 144)

2. 1931 plat showing lands of H.C. Minor (EDC Exhibit 149) described in mortgage (EDC Exhibit 150)

3. Survey of the Intracoastal Waterway recorded March 11, 1931 (Exhibits 145 and 145a)

4. Plat attached to boundary agreement between Daspit and Robbins recorded April 15, 1981 (EDC Exhibit 115)

29. The following plat was of record before all of the surface owners in this litigation, *except the Fisters,* acquired their interest in the surface:

Charles Camp 1979, last revised 1986 plat (EDC Exhibit 141a) attached to the sale from Robbins to AG–Lands ADMITTED TRUTH OF REVISION.

30. If EDC has established ownership of one large contiguous servitude, operations on the southern portion of such a servitude would be sufficient to maintain the entire servitude.

31. ADMITTED AS CHANGED.

The following tabulation correctly identifies seven productive wells (10 completions), their production history and geographical location.

| Well No. | Serial No. | Production | Sec./Twn/Range |
|---|---|---|---|
| 13 | 115636 (Dual Completion) | 11/66, 08/67—08/70, 10/70—12/77 | Sec. 64, T17S–R16E |
| 13 | 118216 | 08/67—12/74 | |
| 19 | 147928 (Dual Completion) | 11/75—12/75, 11/75—11/76 | Sec. 66, T17S–R16E |
| 19 | 148364 | | |
| 23 | 162405 (Dual Completion) | 05/80—07/80, 12/80, 04/81, 7/81 —6/82 | Sec. 83, T17S–R16E |
| 23 | 164850 | 05/80—12/80 | |
| 26 | 169534 | 05/81—11/82, 02/83—12/83 | Sec 1, T18S–R16E |
| 29 | 186132 | 06/84—07/85 | Sec. 3, T18S–R16E |
| 32 | 203326 | 11/86—03/89, 08/89—06/90 | Sec. 83, T17S–R16E |
| 38 | 221134 | 05/98—Present | Sec. 1, T18S–R16E |

32. DENIED.

33. DENIED.

34. DENIED.

35. Six (6) wells were drilled *within the subject Protective Area* by lessees of Pelto and EDC subsequent to May 3, 1971. These wells are nos. 19, 26, 33, 34, 36 and 38 on EDC Exhibit 166 and *in globo* exhibit 152.

36. DENIED.

37. ADMITTED AS CHANGED IN RESPONSE.

The records of Terrebonne Parish reflect the existence of four "cut-outs" recorded between September 8, 1944 and the May 3, 1971 mineral conveyance from Southdown Lands to Pelto.

38. EDC's 1971 mineral servitude does not cover the minerals underlying such tracts both by virtue of the language of the 1971 mineral conveyance itself and, in any event, by operation of law. (One cannot convey what one doesn't own.)

39. ADMITTED AS CHANGED.

These "cut-outs" do not destroy the contiguity of the mineral servitude as claimed by EDC.

40. Pelto executed twenty-two mineral leases and one option to various lessees covering some or all of the subject Protective Area. (EDC Exhibits 28, 30, 35, 39, 40, 41, 42, 43, 44, 49, 51, 53, 62, 63, 65, 70, 80, 83, 84, 86, 87, 88 [option] and 91).

41. Not one of the mineral leases, or the option, excluded any of the twenty sands listed in the August 31, 1966 agreement.

42. ADMITTED AS CHANGED.

No mineral leases covering any portion of the Protective Area were filed in the public record by Southdown Lands or its successors to the surface ownership of the subject Protective Area during the *twenty-six year* period after the May 3, 1971 conveyance, until May 9, 1997 when the St. Martin Group executed a lease to LL & E.

43. ADMITTED AS CHANGED.

Pelto conveyed to Aminoil, Inc a 60% mineral interest' in one of the twenty listed sands, the "D–12" sand listed on page 3 of Exhibit "I" to the August 31, 1966 agreement. (EDC Exhibit 52) The document speaks for itself.

44. DENIED.

45. DENIED.

46. A "line" is a one-dimensional extent of length defined by two points or one point and a direction (i.e. bearing, azimuth or angle).

47. DENIED.

48. DENIED.

49. DENIED.

50. DENIED.

51. DENIED.

52. DENIED.

53. DENIED.

54. The word "servitude" does not even appear in the August 31, 1966 agreement in connection with the *Protective* Area, only with respect to the *Productive* Area.

## II. STIPULATIONS DERIVED FROM ST. MARTIN, ET AL.'S PROPOSED FINDINGS OF FACT

1. Description of Parties:

A. Energy Development Corporation ("EDC"), a Delaware Corporation [a New Jersey corporation when suit was filed] with its principal place of business in Oklahoma is the plaintiff in both of the consolidated actions and is a defendant in the interpleader filed by The Louisiana Land and Exploration Company.

B. The Louisiana Land and Exploration Company ("LL & E"), a Maryland corporation with its principal place of business in Texas is a defendant in Civil Action 98–3395 in which it provoked the interpleader. LL & E is not a party to Civil Action 99–1793.

C. Michael X. St. Martin and Virginia Rayne St. Martin ("St.Martins"), husband and wife, are individual residents of Terrebonne Parish, Louisiana. The St. Martins are defendants in both of the consolidated actions and are also defendants to the interpleader filed by The Louisiana Land and Exploration Company.

D. Quality Environmental Processes, Inc. ("Quality"), a Delaware Corporation with its principal place of business in Louisiana, is a defendant in both of the consolidated actions and is also a defendant to the interpleader filed by The Louisiana Land and Exploration Company.

E. Bayou Area Children's Foundation, Inc. ("Foundation"), a Louisiana Corporation, is a defendant in both of the consolidated actions and is also a defendant to the interpleader filed by The Louisiana Land and Exploration Company.

F. Samuel J. Stagg, III, M.D. and Julie W. Stagg ("Staggs"), husband and wife, are individual residents of Terrebonne Parish, Louisiana. The Staggs are defen-

dants to the interpleader filed by The Louisiana Land and Exploration Company.

G. James G. Fister and Linda F. Fister ("Fisters"), husband and wife, are individual residents of Terrebonne Parish, Louisiana. The Fisters are defendants to the interpleader filed by The Louisiana Land and Exploration Company.

2. DENIED.

3. The mineral rights in question are within the "Lake Hatch Field–Sunrise Field" area in Terrebonne Parish, Louisiana.

4. ADMITTED AS CHANGED.

The property of the St. Martin Group (Michael and Virginia St. Martin, and QEPI) is shown on the plat prepared by Charles M. Camp ("Camp plat") dated Revised January 6, 1999, a copy of which appears in the record of this case.[1] As to the St. Martin Group, the area outlined and cross-hatched in green on the Camp plat is the relevant contiguous tract for these consolidated cases.

4(A). The property under which the St. Martins claim ownership of the minerals in these consolidated cases was acquired through a series of mesne conveyances culminating in the following documents: (a) AG–Lands Investment Co. to Michael St. Martin et ux, dated June 11, 1984, recorded under Clerk's File No. 739234, Terrebonne Parish, Louisiana[2]; (b) AG–Lands Investment Co. to Michael St. Martin et ux, dated October 24, 1984, recorded under Clerk's File No. 744732, Terrebonne Parish, Louisiana[3]; and (c) Cash Sale Deed by Contran Realty Corporation to Michael X. St. Martin and Virginia Rayne

St. Martin dated June 23, 1992 recorded under Clerk's File No. 900447[4] as corrected by instrument dated September 4, 1992, recorded under Clerk's File No. 903752[5], Terrebonne Parish, Louisiana.

5. The property under which the Staggs claim ownership of the minerals in this case was acquired through a series of mesne conveyances culminating in the following documents: (a) Cash Sale dated September 10, 1987 from Ag–Lands Investment Company to Samuel J. Stagg, III, M.D. and Julie W. Stagg, filed under Clerk's File No. 810398, COB 1113 Folio 364, Terrebonne Parish, Louisiana[6]; and (b) Cash Sale dated February 12, 1988 from Ag–Lands Investment Company to Samuel J. Stagg, III, M.D. and Julie W. Stagg, filed under Clerk's File No. 820404, COB 1133 Folio 739, Terrebonne Parish, Louisiana[7].

6. ADMITTED AS CHANGED.

The property under which the Fisters claim ownership of the minerals in this case was acquired through a series of mesne conveyances culminating in the following documents: (a) Cash Sale dated June 6, 1984 from Ag–Lands Investment Company to James Gary Fister, filed June 8, 1984 under Clerk's File No. 734278, Terrebonne Parish, Louisiana[8]; and (b) Cash Sale dated February 10, 1984, from Ag–Lands Investment Company to James Gary Fister, et ux., filed under Clerk's File No. 725824, Terrebonne Parish, Louisiana[9].

7. The property under which the Foundation claims ownership of the minerals in this case was acquired through a series of mesne conveyances culminating in the following documents: (a) Donation by Mi-

1. St. Martin Exhibit 230b; EDC Exhibit 174.

2. St. Martin Exhibit 26; EDC Exhibits 146, 192.

3. St. Martin Exhibit 27; EDC Exhibits 147, 194.

4. St. Martin Exhibit 21; EDC Exhibit 73.

5. St. Martin Exhibit 22; EDC Exhibit 75.

6. Joint Exhibit; EDC Exhibit No. 242.

7. Joint Exhibit; EDC Exhibit No. 243.

8. Joint Exhibit; EDC Exhibit No.240.

9. Joint Exhibit; EDC Exhibit No. 238.

chael X. St. Martin, *et ux.* to Bayou Area Children's Foundation, dated December 28, 1989, recorded under Clerk's File No. 858288, Terrebonne Parish, Louisiana [10]; and (b) Donation by Michael X. St. Martin, *et ux.* to Bayou Area Children's Foundation dated December 20, 1991, recorded under Clerk's File No. 895176, Terrebonne Parish, Louisiana [11].

8. The St. Martins do not claim ownership of minerals under the property donated to the Foundation.

9. Quality claims a ten (10%) percent mineral interest in the fee property owned by the St. Martins. It acquired its interest through a conveyance from Michael X. St. Martin and Virginia Rayne St. Martin dated August 15, 1994 [12].

10. ADMITTED AS CHANGED.

As to the St. Martins and Quality, the property which is the subject of the captioned matter is included in a larger contiguous tract of property located in Terrebonne Parish, Louisiana owned by the St. Martins and in which Quality claims its mineral interest. With the possible exception of Drill Site No. 4, the description of the larger property (hereinafter referred to as St. Martin Contiguous Property) is described as follows:

I. A tract of land being described as all of Section 58, 59, 60, 61 & 62 and a portion of Section 63, 64, 65, 66, & 104 of T17S–R17E and Section 13 of T18S–R17E and a portion of Section 64, 65 & 66 T17S–R16E being more fully described as follows:

Commencing at the township comers of T17 & 18S–R16E and T17 & 18S–R17E said point being the POINT OF BEGINNING;

THENCE, east along township line between T17 & 18S–R17E to the northwest corner Section 13 of T18S–R17E;

THENCE, south along the west line Section 13 T18S–R17E to the southern corner of Section 13;

THENCE, northeasterly along the eastern line of Section 13 T18S–R17E and the eastern line of Section 59 & 58 of T17S–R17E to the Northeast corner of Section 58 T17S–R17E; or projection thereof to the easterly line of Mandalay Plantation.

THENCE N 411 W along the eastern property line of Mandalay Plantation a distance of 2,956 ±;

THENCE, N 3204′W along said property line a distance of 885′ ± to a point;

THENCE, S 6105′W a distance of 7,786′ ± to the range line between T17S–R16 & 17 E;

THENCE, north along range line a distance of 675′to a point;

THENCE, S 6043′W along the centerline of a drainage ditch or the projection thereof that separates the cultivation from the wooded area to the intersection of the east/west red line as shown on Exhibit D attached to that certain conveyance from Southdown, Inc. to Southdown Exploration, Inc. dated August 31, 1966 and recorded at COB 433 Page 128 Entry No. 315794 said intersection being in Section 64 T17S–R16E;

THENCE, east along said red line to the range line between T17S–R16 & 17E;

THENCE, south along range line between T17S–R16 & 17E to the township corner said corner being the POINT OF BEGINNING.

LESS AND EXCEPT

22 ACRES MORE OR LESS DESCRIPTION OF A TRACT OF LAND LOCATED IN SECTIONS 58 & 59, T17S–R17E, AND IN SECTION 13, T18S–R17E, TERREBONNE PARISH, LOUISIANA

---

10. Joint Exhibit; EDC Exhibit No. 196.

11. *Joint Exhibit; EDC Exhibit 197.*

12. St. Martin Exhibit 24; EDC Exhibit 82.

COMMENCING, at the northeast corner of Section 58, T17S–R17E, being Point A;

THENCE, southwesterly along the eastern line of Section 58 & 59, T17S–R17E, and the eastern line of Section 13, a distance of approximately 9,050 feet to the south corner of Section 13, T18S–R17E, to Point B;

THENCE, north along the west line of Section 13, T18S–R17E, a distance of approximately 640 feet to the southerly or easterly right-of-way line for the Gulf Intracoastal Waterway, to Point C;

THENCE, northeasterly along the easterly right-of-way line for the Gulf Intracoastal Waterway a distance of approximately 8,450 feet to the intersection with the north line of Section 58, T17S–R17E, to Point D;

THENCE, northeast a distance of approximately 180 feet to the northeast corner of Section 58, T17S–R17E, being Point A, the point of commencement.

LESS AND EXCEPT

DRILL SITE NO. 2 AS DE-SCRIBED IN AN ACT OF MINER-AL SUBORDINATION, SALE OF PROPERTY, AND CONVEYANCE OF SERVITUDES RECORDED AT COB 788 FOLIO 493 MAP NO. 5588, TERREBONNE PARISH LOUISI-ANA and

LESS AND EXCEPT

A PORTION OF A 10 ACRE TRACT LOCATED IN SECTION 66 T17S–R16E BEING THAT CER-TAIN CONVEYANCE FROM SOUTHDOWN LANDS, INC. TO ST. ANTHONY TELEVISION COR-PORATION AND RECORDED AT ENTRY NO. 401446 AND MAP VOLUME 15 FOLIO 5A, TERRE-BONNE PARISH, LOUISIANA

II. A 165.000 acre tract of land located in Mandalay Waterproof Plantation, Section 104, T17S–R17E, Terrebonne Parish, Louisiana, being more fully described as follows:

COMMENCING at a point located S4901'51"W a distance of 15,415.32 feet from U.S.C. & G.S. triangulation station "Houma 1934" and being the Point of Beginning;

THENCE, S3222'27"E, a distance of 3,218.31 feet to a point;

THENCE, S6105'00"W, a distance of 2,741.66 feet to a point;

THENCE, N3222'27"W, a distance of 2,406.32 feet to a point on the ordinary low water line of Bayou Black;

THENCE, meander on and along the ordinary low water line of Bayou Black as follows:

N4337'41"E, a distance of 100.67 feet to a point;

THENCE, N4532'17"E, a distance of 192.53 feet to a point;

THENCE, N5702'12"E, a distance of 130.92 feet to a point;

THENCE, N6639'01"E, a distance of 194.74 feet to a point;

THENCE, N5611'06"E, a distance of 204.23 feet to a point;

THENCE, N4620'39"E, a distance of 155.22 feet to a point;

THENCE, N5321'20"E, a distance of 251.15 feet to a point;

THENCE, N4842'58"E, a distance of 219.82 feet to a point;

THENCE, N4413'31"E, a distance of 204.88 feet to a point;

THENCE, N3930'40"E, a distance of 217.27 feet to a point;

THENCE, N3622'20"E, a distance of 159.54 feet to a point;

THENCE, N3445'53"E, a distance of 201.29 feet to a point;

THENCE, N3215'45"E, a distance of 155.50 feet to a point;

THENCE, N3025'47"E, a distance of 262.47 feet to a point;

THENCE, N3323'55"E, a distance of 207.85 feet to the Point of Begin-

ning and containing a gross acreage of 169.0000 acres of land, more or less.

The above described tract of land is more fully shown on a plat prepared by T. Baker Smith & Son, Inc. and titled "SURVEY OF A 165.0000 ACRE TRACT OF LAND FOR PROPOSED SALE FROM JAMES G. ROBBINS TO MICHAEL ST. MARTIN LOCATED IN MANDALAY–WATERPROOF PLANTATION, SECTION 104, T17S–R17E, TERREBONNE PARISH, LOUISIANA", dated May 25, 1984.

LESS AND EXCEPT:

A 4.00 acre drill site No. 3 conveyed to Pelto Oil Company under Act of Mineral Subordination, sale of property, and conveyance of servitude recorded in Terrebonne Parish Courthouse, Entry No. 620346 and Map No. 5588;

A 1.2614 acre tract of land conveyed by Act of Donation by Michael X. St. Martin and Mary Virginia Rayne St. Martin to Bayou Area Children's Foundation, Inc. recorded in Terrebonne Parish Courthouse, Entry No. 858288;

A tract of land measuring 120′ front more or less along southerly right-of-way of U.S. Hwy. 90 by a depth of 308.73′ more or less bounded East by 1.2614 acre tract described above. Recorded in Terrebonne Parish Courthouse Entry No. 895176.

III. A 32.0155 acre tract located in Mandalay–Waterproof Plantations Sections 64, 65 & 104, T17S–R17E, Terrebonne Parish, Louisiana, being more fully described as follows:

COMMENCING at a point located S4821′39″W, a distance of 18,842.50 feet from U.S.C. & G.S. Triangulation Station "HOUMA 1934" and being the Point of Beginning;

THENCE, S3113′21″E, a distance of 2,285.41 feet to a point;

THENCE, S6105′00″W, a distance of 625.00 feet to a point;

THENCE, N3209′05″W, a distance of 2,184.68 feet to a point on the ordinary low water line of Bayou Black;

THENCE, meander on and along the ordinary low water line of Bayou Black as follows:

N4918′03″E, a distance of 205.11 feet to a point;

THENCE, N5312′25″E, a distance of 190.44 feet to a point;

THENCE, N5156′43″E, a distance of 162.13 feet to a point;

THENCE, N5523′24″E, a distance of 67.32 feet to the Point of Beginning and containing 32.0155 acres of land, more or less.

The above described tract is more fully shown on a plat prepared by T. Baker Smith & Son, Inc. titled "SURVEY OF A 32.0155 ACRE TRACT OF LAND BELONGING TO JAMES G. ROBBINS IN MANDALAY–WATERPROOF PLANTATIONS, SECTIONS 64,65 & 104, T17S–R17E, TERREBONNE PARISH, LOUISIANA" dated October 3, 1984.

IV. A 33.2547 acre tract of land located in Mandalay Waterproof Plantations, Sections 63, 64 & 104, T17S–R17E, Terrebonne Parish, Louisiana, being more fully described as follows:

COMMENCING at a point located S 4818′23″ W a distance of 18,219.35 feet from U.S.C. & G.S. triangulation station, "Houma" (1934) and being the point of beginning;

THENCE, S 3222′27″ E a distance of 2,406.32 feet to a point;

THENCE, S 6105′00″ W a distance of 625.00 feet to a point;

THENCE, N 3213′21″ W a distance of 2,285.41 feet to a point on the ordinary low water line of Bayou Black;

THENCE, meander on and along the ordinary low water line of Bayou Black as follows:

N 5523'24" E a distance of 177.43 feet to a point;

THENCE, N 5059'04" E a distance of 159.98 feet to a point; THENCE, N 4704'02" E a distance of 200.51 feet to a point;

THENCE, N 4337'41" E a distance of 87.08 feet to the point of beginning and containing 33.2547 acres of land, more or less.

The above described tract of land is more fully shown on a plat prepared by T. Baker Smith & Son, Inc., and titled, "Survey of a 33.2547 Acre Tract of Land Belonging to James G. Robbins in Mandalay–Waterproof Plantations, Sections 63, 64 and 104, T17S–R17E, Terrebonne Parish, Louisiana", dated September 17, 1984.

(hereinafter referred to as St. Martin Group Contiguous Property).

11. DENIED.

12. DENIED.

13. DENIED.

14. DENIED.

15. DENIED.

16. DENIED.

17. DENIED.

18. DENIED.

19. DENIED.

20. DENIED.

21. DENIED.

22. DENIED.

23. By letters dated June 5, 1997 [13], June 9, 1997 [14] and July 3, 1997 [15], from A.J. Gray, III on behalf of the St. Martins demand was made pursuant to La. R.S. 31:206 for EDC to furnish recordable acts evidencing the extinguishment or termination by prescription of all mineral rights it may have owned or claimed in, on or under the St. Martin Contiguous Property. EDC did not comply with the demand.

24. DENIED.

25. By virtue of Office of Conservation Order No. 276V, dated May 21, 1998, filed in the Conveyance Records of Terrebonne Parish June 8, 1998 in Book No. 1607 at Entry No. 1022218, the Louisiana Commissioner of Conservation created the 88 Sand Reservoir A Unit and the 88 Sand Reservoir B Unit both in the Hollywood Field, Terrebonne Parish, Louisiana (collectively the "Units").

26. The Louisiana Commissioner of Conservation designated the Louisiana Land and Exploration Company Cenac No. I Well as the Unit Well for the 88 RA SUA Unit, and the Burlington Resources Phillips No. 1 Well as the Unit Well for the 88 RB SUA Unit.

27. ADMITTED AS CHANGED.

According to the Order of the Commissioner, LL & E was designated the operator of the Units, thus making LL & E the operator of all interests in the Units for the production of unitized oil, gas and other hydrocarbons.

28. As operator, LL & E has produced and sold oil, gas and other hydrocarbons from the Units.

29. The funds deposited into the registry of this Court have accrued because of the production of unitized oil, gas and other hydrocarbons from the Units and the disposition of same by LL & E.

30. The LL & E Cenac Family Properties LLC Well No. 1, the unit well for the 88 RA SUA Unit, Hollywood Field, Terrebonne Parish, Louisiana was ready to produce on December 3, 1997 and was turned into tanks on December 6, 1997. Prior to institution of Civil Action No. 98–3395, neither the Foundation nor the St. Martins received division orders from LL & E for production from the well involved in these

---

13. EDC Exhibit 246.

14. EDC Exhibit 247.

15. Joint Exhibit; EDC Exhibit 248.

proceedings; no accounting for production from the wells had been made by LL & E; and no royalties had been paid by LL & E.

The Stipulations detailed above in Sections I and II were entered into by the parties in open court on Monday, May 8, 2000, the first day of the bench trial as to liability in the captioned consolidated proceedings. Both counsel for the plaintiff and counsel for the defendants have reviewed the above and assured the Court that this document comports with their May 8th stipulations in open court.

Accordingly,

IT IS ORDERED that the foregoing be filed in the record of these proceedings and the counsel for the parties may refer to these stipulations by record document number as they may deem appropriate in their respective post-trial memoranda which will be addressed to the Court.

May 25, 2000